## STATE v. PETRALIA.

No. 7408 . Decided August 28, 1950. (221 P. 2d 812).

See 22 C. J. S. Criminal Law, Sec. 812.   Larceny prosecution, whether petit or grand, depends on evidence, 79 A. L. R. 1181.   See, also, 32 Am. Jur. 1072.

*Arthur Woolley,* Ogden, for appellant.

*Clinton D. Vernon,* Attorney General, *Quentin L. Alston,* Assistant Attorney General, for respondent.

McDONOUGH, Justice.

Defendant was charged with robbery and convicted of grand larceny, and he appeals.   The information and bill

of particulars specifically charged stealing and taking from the immediate presence of two named men the sum of approximately $27,300, by means of force and fear, on or about June 25, 1948, at a place known as "The Club" in Ogden.

Tony Salerno, an admitted accomplice in the crime, worked at "The Club" for some years prior to entering military service. He had known defendant for over 20 years. Salerno knew that the Pappas brothers, George and Harry, who operated The Club, kept on hand at certain times large sums of money to cash checks of railroad employees and employees of other firms. Salerno testified that he made a trip to California with a girl friend in the spring of 1948. While there he visited the defendant and they discussed the possibilities of raising money by robbery or theft at The Club. Salerno informed defendant of the manner in which the money was handled and kept at The Club. Defendant agreed to discuss the matter further on coming to Ogden. After reaching Ogden, Salerno had an altercation with his girl friend, was arrested and lodged in the city jail.

Prior to June 15, 1948, when Salerno was released on bond, Petralia (defendant) came to Ogden and brought fruit and cigarettes to Salerno in jail, and on such occasion interviewed him in jail as to a plan of robbery. On his release, Salerno redeemed a gun from pledge and turned the same over to defendant on June 17th. By prearrangement, defendant left Ogden and returned about June 23rd, bringing with him two men from California to assist in the proposed robbery. Defendant suggested that Salerno hang around The Club on June 24th, which was the day before a payday at certain firms nearby, to make sure that substantial sums of money were brought there, and to ascertain where the funds were kept. On June 24th, George Pappas brought $12,000 from the bank, to supplement

other funds at such beer tavern. Salerno stayed around most of the evening and talked with one of the Pappas brothers. He stayed after the place was closed, and left with Harry Pappas who was on duty that evening. Two night men were left at The Club when Pappas left. Those two cleaned up the place at night and during the early morning hours, checked on the draught beer equipment, and watched the place.

Salerno was acquainted with both of the night men, and they frequently permitted him to enter the place after hours with friends to gamble. About 2:30 or 3:00 a.m. Salerno knocked on the front door of The Club, and when asked why he wanted to get in at that hour stated that he and his friend (who was one of the alleged robbers) wanted to use the toilet, and entrance was granted. The attendant who admitted these two men then went about his work, and Salerno proceeded toward the rear of the premises, indicating to the gunman who accompanied him, where the money was kept. These two ostensibly went into one of the toilet rooms, but actually Salerno went to the back door and released the night-latch and thereby unlocked the door. He then went into the toilet room and flushed a toilet, and the two men went toward the front where they induced one of the night men to give them each a bottle of beer. Salerno indicated to the gunman the position of the money drawer while drinking the beer. They then left by way of the front door, and reported to defendant a short distance away. The defendant, Salerno, and the two gunman then drove in defendant's car to a place somewhat closer to "The Club". Defendant remained in the car, Salerno led the gunmen to the rear door where the gunmen who wore overalls, loaded their guns and put on masks. The two gunmen then entered by way of the rear door which Salerno had unlocked a few minutes previously.

The gunmen took the night-men by surprise, held their

guns on them and tied them up hurriedly with binding twine and placed adhesive tape over their mouths. They then went to the money drawer, pried it open with some instrument, and removed the money box and the contents. One of the night-men saw one of the gunmen carry something out in a bartender's apron. After they carried the money away, which the Pappas brothers claimed to amount to $27,300, the gunmen and Salerno joined defendant, who took over the money. Salerno said he needed some then, and was given $93. It was agreed that it would be unwise to have these men remain together, and that they were to meet at some subsequent time in California and divide the money so stolen.

When one of the night-men saw the gunmen leave, he worked to free himself, and he found the other one free by the time he reached him. One of them went upstairs to a hotel telephone and called one of the Pappas brothers. The police were notified and responded in several minutes. Shortly thereafter Salerno was arrested and charged with robbery. At the end of seven days he confessed having participated in it and he implicated defendant, but he stated that he was unable to identify the two gunmen.

Following the date Salerna confessed, George Pappas called defendant Petralia on the telephone at Bell, California, and asked for reimbursement. Several additional calls were made, and subsequently Pappas went to Los Angeles and interviewed defendant personally. Defendant did not deny that he had conversations over the telephone nor that Pappas visited him. He did strenuously deny that Pappas was promised or given any money. Pappas testified that defendant said that the amount taken in the robbery did not exceed $17,000 and that he had already divided the money, but finally agreed that he would pay a total of $10,000 to call off the prosecution. According to Pappas, defendant delivered $6,000 in currency in a shoebox just

as Pappas left Los Angeles. When the balance of $4,000 was not sent, Pappas went to the police.

Defendant denied that he participated in the robbery or aided or abetted its commission. He denied that he was in Ogden at the time the crime was committed. Some of his witnesses testified to seeing him in Bell, California, the day prior to the crime and on the day of the commission of the offense as well as on the day subsequent. The cross examination of these witnesses doubtless created some doubt in the minds of the jurors as to the accuracy of the recollection of the particular dates. It was disclosed that both defendant and Salerno were ex-convicts.

The alleged reversible errors specified by appellant may be summarized as follows: (1) Failure to grant a new trial or to direct a verdict for defendant in the first instance, by reason of lack of sufficient corroboration of the testimony of an admitted accomplice. (2) Refusal to exclude certain exhibits and certain testimony offered by the state. (3) Errors in the charge to the jury. (4) Prejudicial error in contempt proceedings.

Appellant contends that the court should have granted a new trial or should have directed a verdict for defendant instead of submitting the case to the jury, by reason of insufficient evidence of corroboration of the testimony of an admitted accomplice. The argument of appellant disregards a considerable portion of the record. Sec. 105—32—18, U. C. A. 1943 specifies:

"A conviction shall not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimony of the accomplice tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient, if it merely shows the commission of the offense or the circumstances thereof."

Salerno testified to the plans for the robbery in detail, and also as to the manner of its commission. The statute

requires that the corroboration must be of such a character that it "tends to connect the defendant with the commission of the offense." The statute does not require that the corroboration shall be sufficient to prove each and every element of the offense beyond a reasonable doubt. Measured by the standard set forth in the statute, the corroboration was clearly ample.

A police officer testified that he saw defendant in Ogden on June 24th, which was the day on which the final plans for the robbery were made. Such testimony contradicted defendant's testimony that he was in California on the 24th and not in Ogden. When Salerno confessed after spending a week in jail, he implicated defendant. George Pappas, one of the operators of The Club, shortly after such confession on the part of Salerno, called defendant on the telephone at Bell, California. Several telephone calls were made, and Pappas went to California and had an interview with defendant. During the course of such calls and visit, according to the testimony of Pappas, defendant admitted he participated in the crime, but contended that only $17,000 was obtained in the robbery and that the money had been divided; that he would pay $10,000 back to call off the prosecution; that he was to pay $6,000 immediately and $4,000 within a specified time; that $6,000 was paid by delivery of such sum in a shoebox to Pappas in Los Angeles the day he returned to Ogden; and that the balance was not paid, the defendant claiming that the other participants were not contributing their share of the money obtained in the theft. Harry Pappas testified that his brother George opened the shoebox in his presence on his return from Los Angeles and counted the $6,000 with him. While defendant denied that money was discussed, he admitted on cross-examination that there were several telephone calls and a visit. He testified that while they visited for an hour and a half during which time they rode together and ate together, all that was said was that George was

glad to see him, and that it was a "nice day, you know," and that George came there to see some people. As to the telephone calls, defendant testified that there might have been several of them but that he could not recall just when, and that all he could remember of the conversations had during such calls was that George said, "hello", and "how are you", and "nice day" or something of that character. The girl friend of Salerno testified that she overheard some of the discussion with defendant about getting money at The Club, although she was unable to hear the entire conversation.

One of defendant's own witnesses, who testified as to his recollection of seeing defendant in California on June 24, 1948, related that on June 27th or 28th, 1948, defendant came to him and said he was in trouble; that he was accused of a holdup in Ogden, Utah; that something was mentioned about a warrant for his arrest; and that defendant wanted the witness to remember seeing defendant on June 24th at Bell, California. Such testimony evidenced guilty knowledge on the part of defendant, since no warrant for his arrest had been issued up to that time, and it was not until Salerno confessed on July 1, or 2, 1948, that defendant was accused of participation in such crime. It was admitted that defendant's car had passed through a California inspection station on June 26th on a return trip into that state, but defendant claimed that a nephew was then using his car.

There was ample evidence to sustain the conviction. The testimony of the accomplice was sufficiently corroborated.

There was no prejudicial error in the admission in evidence of certain exhibits which had to do with the methods of computation of the sums lost in the theft, nor as to exhibits

showing the practice of withdrawing substantial sums of money from the bank just prior to certain ■ industrial pay days. Such evidence tended to show a practice, and substantiated Salerno's testimony that he knew of such practice. Even if some of the exhibits were merely cumulative evidence, no prejudice has been shown.

With respect to the admission of evidence as to dates when long distance telephone calls were made ■ between the Pappas premises and the defendant's home in Bell, California, no prejudice was shown in failing to produce the telephone company's original records. The evidence was sufficiently connected with other evidence to show that telephone calls were made by Pappas to defendant on the dates indicated, and the testimony showed that such calls involved discussion of the implication of defendant in the robbery.

It is next contended that the court erred in its charge to the jury, and in refusing to give some of the instructions requested by appellant. One of the alleged errors in the charge to the jury consisted of giving part of the definition of robbery and designating it grand larceny. The material portions of the statutes defining grand larceny and robbery are as follows:

Sec. 103—36—4. "Grand larceny is committed in either of the following cases:

"(1) When the property taken is of value exceeding $50.

"(2) When the property taken is from the person of another.

"(3) * * *."

Sec. 103—49—1. "Robbery is the felonious taking of personal property in the possession of another from his person, or immediate presence, against his will, accomplished by means of force or fear."

In the charge to the jury the court in instructing on the definition of grand larceny stated that it consists in larceny of property "When the property taken is from the immediate presence of another," rather than from "the person of another." The portion of the statute relative to the value of the property taken was not called to the attention of the jury. The state in support of the instruction cites *State v. O'Day,* 93 Utah 387, 73 P. 2d 965, 966, wherein this court in discussing alleged error of the trial court in failing to instruct on petit larceny, stated "We have read the transcript carefully, and, if any property was taken, it was taken from the person or immediate presence of the complaining witness, so it could not be less than grand larceny or robbery." We need not pause to inquire whether the cited cases supports the contention of the state, or indeed whether the instruction given by the court was strictly accurate. Suffice it to say that the instruction, even assuming it to be erroneous, could not have prejudiced the defendant. If the jury found that some property was taken, as by its verdict it did find, it could not find under the evidence that the amount taken was not greatly in excess of $50. According to the testimony of George Pappas, the defendant stated that the amount taken was not $27,000 as contended by Pappas but only $17,000. No evidence or inference therefrom would support a finding that the amount taken would come within the definition of petit larceny.

Some complaint is made of the failure of the court to charge the jury that all of the instructions must be construed as a whole. No prejudice is shown. Counsel for defendant in his argument to the jury advised the jury to that effect. Nor is there any merit to the contention that the jury was led to believe that the court wanted the jury to conclude that the defendant was guilty. By instruction No. 27 the court specifically charged that the court "does not express any opinion of any of the

facts in the case" and the court did not "intimate or mean or wish to be understood as giving an opinion as to what the proof is or what it is not."

Nor did the court err as contended in refusing to charge the jury that if the Pappas brothers "framed" the robbery with Salerno, or connived with him or with any one else, there was not in fact a robbery. Any inference to be drawn from the evidence which might tend to show connivance between the alleged robbers and the victims was a matter for argument to the jury and did not call for an instruction relative thereto. If the jury believed that the alleged robbery or larceny was with the consent of the owners of the property, the instructions of the court would preclude conviction.

The court did not err in its charge with respect to the necessity for corroboration of the testimony of Salerno as an accomplice. We have already pointed out that his testimony was sufficiently corroborated.

The court at the outset of the trial found defendant in contempt for failure to appear for trial at the time he was notified to appear. Those proceedings were not in the presence of the jury. Appellant says the court fined him excessively by levying a fine of $208 when the statutory maximum was only $200. No appeal was taken from the judgment in the contempt proceedings. It is therefore, not before us for review. The record does not reveal how the contempt proceeding could possibly have influenced the verdict.

The judgment is affirmed.

WADE, WOLFE and LATIMER, JJ., concur.

PRATT, C. J. dissents.